# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ANTHONY SCOTT PRUITT, AUDREY PRUITT, and all other similarly situated individuals, | |
| Plaintiffs, | Case No. 1:20-CV-01084-JES-JEH |
| vs. | **Oral Argument Requested** |
| PAR-A-DICE HOTEL CASINO, BOYD GAMING CORPORATION, and any and all other affiliated or subsidiary entities, | |
| Defendants | |

## DEFENDANTS PAR-A-DICE HOTEL CASINO AND BOYD GAMING CORPORATION'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ............................................................................................................................2

I.      The Illinois Biometric Information Privacy Act .............................................................2

II.     Summary Of Plaintiffs' Claims .....................................................................................4

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................5

I.      Par-a-Dice Hotel Casino .................................................................................................5

II.     The Sportsbook ...............................................................................................................6

III.    PAD's Surveillance System .............................................................................................6

IV.     Biometrica Software ........................................................................................................7

V.      Appearance Search..........................................................................................................8

VI.     "Site Health" Reports.....................................................................................................11

VII.    Plaintiffs Anthony and Audrey Pruitt .........................................................................12

ARGUMENT ...............................................................................................................................13

I.      The Undisputed Evidence Shows That Defendants Did Not Collect, Possess, Or
        Obtain Plaintiffs' Biometric Identifiers Or Biometric Information. ...........................14

II.     Any New Theory That Defendants Violated BIPA Through The Purported Use Of
        "Appearance Search" Also Fails For Multiple Reasons ...............................................15

        A.      There Is No Evidence That Plaintiffs Even Entered The Part Of The Casino
                ████████████████████████████████████████████ .......16

        B.      It Is Undisputed That Plaintiffs Wore Face Masks When Visiting PAD In
                Accordance With Mandatory COVID-19 Restrictions....................................17

        C.      There Is No Evidence That Appearance Search Is Regulated by BIPA. .........18

III.    Defendants Are Also Entitled To Summary Judgment On Damages..........................20

        A.      There Is No Evidence That Defendants Acted Negligently............................21

        B.      There Is No Evidence That Defendants Acted Intentionally Or Recklessly. ..22

CONCLUSION.............................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................... 14

*Bd. of Educ. of City of Chicago v. Illinois State Bd. of Educ.*,
    2017 IL App (1st) 161147.............................................................................................. 3

*Bethel v. Aikens*,
    1994 WL 266565 (D. Ind. Mar. 9, 1994).................................................................... 20

*Brown v. Navarro*,
    2012 WL 3987427 (N.D. Ill. Sept. 11, 2012) ............................................................... 5

*Brownell v. Figel*,
    950 F.2d 1285 (7th Cir. 1991) ..................................................................................... 14

*Carman v. Tinkes*,
    762 F.3d 565 (7th Cir. 2014) ....................................................................................... 13

*Davis v. Marathon Oil Co.*,
    64 Ill. 2d 380, 390 (1976) ........................................................................................... 21

*FTC v. Med. Billing Network*,
    543 F. Supp. 2d 283 (S.D.N.Y. 2008).......................................................................... 20

*Great Lakes Dredge & Dock Co. v. City of Chicago*,
    260 F.3d 789 (7th Cir. 2001) ....................................................................................... 21

*Gunville v. Walker*,
    583 F.3d 979 (7th Cir. 2009) ................................................................................. 14, 20

*Harrison v. Hardin Cty. Cmty. Unit Sch. Dist.*,
    313 Ill. App. 3d 702 (2000), *reversed on other grounds,* 197 Ill. 2d 466
    (2001).......................................................................................................................... 21

*Lohrmann v. Pittsburgh Corning Corp.*,
    782 F.2d 1156 (4th Cir. 1986) ..................................................................................... 17

*Poris v. Lake Holiday Property Owners Ass'n*,
    2013 IL 113907............................................................................................................. 3

*Rivera v. Google Inc.*,
    238 F. Supp. 3d 1088 (N.D. Ill. 2017) ..................................................................... 2, 18

*Rogers v. CSX Intermodal Terminals, Inc.*,
    409 F. Supp. 3d 612 (N.D. Ill. 2019) ...................................................................... 22, 23

*State ex rel. Schad v. Nat'l Bus. Furniture,*
LLC, 2016 IL App (1st) 150526 ...................................................................... 23

*Schultz v. Keene Corp.,*
729 F. Supp. 609 (N.D. Ill. 1990) ................................................................. 17

*Sinha v. Bradley Univ.,*
995 F.3d 568 (7th Cir. 2021) ......................................................................... 13

*SportFuel, Inc. v. PepsiCo, Inc.,*
932 F.3d 589 (7th Cir. 2019) ......................................................................... 20

*St. Louis, A & T.H.R. Co. v. Odum,*
156 Ill. 78 (1895) ........................................................................................... 21

*Test Drilling Serv. Co. v. Hanor Co.,*
322 F. Supp. 2d 957 (C.D. Ill. 2003) ............................................................ 21

*Torry v. City of Chi.,*
932 F.3d 579 (7th Cir. 2019) ........................................................................... 9

*United States v. King-Vassel,*
728 F.3d 707 (7th Cir. 2013) ......................................................................... 23

*Valance v. Wisel,*
110 F.3d 1269 (7th Cir. 1997) ....................................................................... 14

*Weaver v. Champion Petfoods USA Inc.,*
3 F.4th 927 (7th Cir. 2021) ............................................................................ 20

*Ziarko v. Soo Line R. Co.,*
161 Ill. 2d 267 (1994) ................................................................................... 22

*Zylstra v. DRV, LLC,*
8 F.4th 597 (7th Cir. 2021) ........................................................................... 14

**Other Authorities**

740 ILCS 14/10 ................................................................................... 2, 3, 19

740 ILCS 14/15 ....................................................................................... 3, 15

740 ILCS 14/20 ....................................................................................... 4, 20

Ill. AG Op., 2017 WL 10084298 ....................................................................... 18

**INTRODUCTION**

Plaintiffs Audrey and Anthony Pruitt filed this putative class action under Illinois's Biometric Information Privacy Act ("BIPA") based on their speculation that Par-a-Dice Hotel Casino ("PAD") used "facial recognition in its video surveillance" at its casino, resulting in plaintiffs' "facial geometry [being] scanned." First Am. Compl. (Dkt. 1-1) ("FAC"), ¶¶ 2, 6. Discovery has now shown that plaintiffs' allegations are unsupported by facts. For this and other reasons set forth below, defendants are entitled to summary judgment.

Simply put, there is no evidence that PAD used "facial recognition in its video surveillance," as plaintiffs have alleged. Plaintiffs deposed three witnesses about PAD's surveillance procedures: Jim Simmons, the Director of Surveillance at PAD; Ryan Klein, a Surveillance Technician at PAD working under Mr. Simmons; and Scott Beck, the Director of Surveillance Technology for all Boyd Gaming properties in the United States. Each witness provided undisputed testimony confirming that the surveillance system at PAD does not use face recognition. They explained that until 2019, PAD's surveillance system was analog, meaning that surveillance footage was captured by ordinary cameras and recorded on VCRs. In July 2019, PAD installed a new surveillance system that includes digital cameras and software licensed from Avigilon. It is undisputed that face recognition is only available from Avigilon with the purchase of additional software licenses, and that ██████████████████████ ██████. Based on these simple and undisputed facts alone, defendants are entitled to summary judgment. Because there is no evidence that defendants collected, possessed, obtained, or stored facial geometry "scans," there is no evidence that defendants violated BIPA.

Plaintiffs may attempt to argue that Avigilon's software includes a different feature called "Appearance Search" █████████████████████████ ████████████████████████████████████████████

Because plaintiffs chose to seek no discovery from Avigilon, there is no admissible evidence

1

in the record regarding how Appearance Search worked as a technical matter.  But the limited evidence in the record about Appearance Search indicates that it does not purport to *identify* people based on their facial geometry; the function detects *objects* in surveillance footage—*e.g.*, "person" or "car"—and allows the user to search for them based on generic characteristics such as the color of the car or the person's clothing.  In any event, the Appearance Search feature is a side-show that fails to raise a disputed issue of fact for trial.  There is no evidence that plaintiffs even visited the Sportsbook, ███████████████████████████████ ██████████████████████████████████ Further, in accordance with Illinois state law, a face mask mandate was instituted at PAD due to COVID-19 several months *before* the Sportsbook opened that made any "scan" of plaintiffs' facial geometry impossible.

Defendants also move for summary judgment on plaintiffs' damages claims.  While there is no evidence to support a finding that defendants violated BIPA at all, there is also no evidence that defendants acted negligently, recklessly, or intentionally to violate the statute as would be necessary for plaintiffs to seek statutory damages.

## BACKGROUND

### I.    The Illinois Biometric Information Privacy Act

BIPA regulates the collection and storage by private entities of (1) "biometric identifiers" and (2) "biometric information."  740 ILCS 14/10.  The definition of "biometric identifier" covers six sources of data: "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry," each of which refers to "a set of measurements of a specified physical component . . . used to identify a person."  *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1096 (N.D. Ill. 2017).  "Face geometry" means the "measurement, properties, and relationships of points, lines, angles, surfaces, and solids" derived from "the front part of the head that . . .

extends from the forehead to the chin and includes the mouth, nose, cheeks, and eyes."[1] Accordingly, a "scan of . . . face geometry" is a set of geometric measurements relating to a person's facial features used for identification.

Other potential biometric identifiers, including "photographs," "demographic data," and "physical descriptions such as height, weight, hair color, or eye color," are expressly excluded from coverage. 740 ILCS 14/10. The definition of "biometric information" includes "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual," and excludes "information derived from items or procedures excluded under the definition of biometric identifiers." *Id.*

Private entities that collect biometric identifiers and biometric information must comply with two requirements at issue in this case: First, an entity "in possession of" biometric data must publish and adhere to guidelines for the retention and destruction of the data. *Id.* 14/15(a). Second, before an entity may "collect, capture, purchase, receive through trade, or otherwise obtain" a person's biometric data, it must (1) inform the person "in writing" of the "specific purpose and length of term" for which biometric data is being "collected, stored, and used"; and (2) obtain a "written release" from that person, defined as "informed written consent." *Id.* 14/10, 14/15(b). Thus, to trigger either provision, a private entity must first "possess," "collect, capture . . . or otherwise" obtain biometric identifiers or biometric information covered by the statute. BIPA also contains provisions about the sale and dissemination of biometric data to third parties (*id.* 14/15(c)-(e)), but plaintiffs do not invoke those provisions.

---

[1] *Geometry*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/geometry (last visited Nov. 19 2021); *Face*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/face (last visited Nov. 19, 2021). "Where a term is not defined in a statute, 'it is appropriate to use a dictionary to ascertain the meaning of an otherwise undefined word or phrase.'" *Bd. of Educ. of City of Chicago v. Illinois State Bd. of Educ.*, 2017 IL App (1st) 161147, ¶ 15 (quoting *Poris v. Lake Holiday Property Owners Ass'n*, 2013 IL 113907, ¶ 48).

BIPA provides a private right of action to any "person aggrieved by a violation of this Act." *Id.* 14/20. A plaintiff may recover the greater of "$1,000 or actual damages" against an entity that "negligently" violates BIPA, or the greater of "$5,000 or actual damages" against an entity that "intentionally or recklessly" violates the Act. *Id.*

## II.   Summary Of Plaintiffs' Claims

In the operative complaint, plaintiffs allege that they visited the casino at PAD on two occasions in January 2020. FAC ¶¶ 20-21. Plaintiffs allege that during those visits, "facial recognition technology" "scanned [their] facial geometry from security camera footage." *Id.* ¶¶ 2-3, 20-22. Plaintiffs assert two claims for alleged BIPA violations. In Count I, plaintiffs allege that defendants collected scans of their facial geometry without obtaining their written consent, as required by Section 15(b) of BIPA. *Id.* ¶¶ 31-36. In Count II, plaintiffs allege that defendants failed to publish a written retention policy as required by Section 15(a). *Id.* ¶¶ 37-43. Plaintiffs seek to represent a class of "[a]ll individuals who had their facial geometry scans collected or possessed by Defendant [*sic*]" from October 2014 to the present. *Id.* ¶ 25.

During the course of discovery, plaintiffs clarified their allegations in two respects. First, plaintiffs contend that scans of their facial geometry were collected on six occasions when they visited the casino at PAD between January 2020 and January 2021. *See* Ex. 1 (Pls. Resp. to Defs. Interrog.) at 3-4[2]; Defs. Statement of Undisputed Material Facts ("SUF") ¶ 55. Second, plaintiffs claim that the alleged "facial geometry scans" occurred at a security desk located at the entrance to the casino. *Id.* at 6-8; *see also* SUF ¶ 56. As set forth below, there is no evidence that supports these claims, and the undisputed facts squarely refute them.

---

[2]      Unless noted, all exhibits referenced herein are to the Declaration of Matthew Provance.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[3]

### I.   Par-a-Dice Hotel Casino

1.      The casino at Par-a-Dice Hotel Casino ("PAD") is located on a riverboat.  Ex. 2 (Simmons Dep.) at 77.

2.      To enter the casino, guests walk through a pavilion area ("Pavilion") and must cross over a ramp that leads to the riverboat.  Ex. 2 (Simmons Dep.) at 77.

3.      There is a security desk at the entrance to the casino.  Ex. 2 (Simmons Dep.) at 34-35; Ex. 3 (Audrey Pruitt Dep.) at 37; Ex. 4 (Anthony Pruitt Dep.) at 44-45.

4.      There is a guest services desk located in the casino for guests enrolled in PAD's "B Connected" customer rewards program.  Ex. 2 (Simmons Dep.) at 45-46.

5.      PAD closed to the public in March 2020 due to COVID-19.  Klein Decl. ¶ 17.

6.      PAD re-opened in July 2020.  Klein Decl. ¶ 17; Ex. 5 (Klein Dep.) at 39.

7.      When PAD re-opened in July 2020, guests were required to wear face masks fully covering their nose and mouth pursuant to Illinois laws enacted in response to COVID-19. Klein Decl. ¶ 18; Ex. 5 (Klein Dep.) at 39;  Ex. 6 (Ill. Executive Order 2020-43).

8.      PAD closed to the public again during a period between November 2020 and January 2021 due to COVID-19.  Klein Decl. ¶ 17.

9.      The face mask requirement remained in place when PAD re-opened in January 2021 until at least May 20, 2021.  Klein Decl. ¶ 18; Ex. 5 (Klein Dep.) at 39.

---

[3]      In accordance with Local Rule 7.1(D)(1), defendants submit this statement only for the purpose of establishing facts as to which there is no genuine issue, warranting judgment for defendants as a matter of law, and make no admissions for any other purpose. *See, e.g., Brown v. Navarro*, 2012 WL 3987427, at *3 (N.D. Ill. Sept. 11, 2012) (citing cases for the principle that facts deemed undisputed for purposes of summary judgment are not established for any other purposes, including trial).

## II.      The Sportsbook

10.      In September 2020, PAD opened the Sportsbook.  Simmons Decl. ¶ 8; Klein Decl. ¶ 9; Ex. 2 (Simmons Dep.) at 44.

11.      The Sportsbook is in a different area of PAD than the casino; guests who visit PAD can enter the casino without entering the Sportsbook or coming within range of the security cameras located in the Sportsbook.  Klein Decl. ¶¶ 15-16.

12.      Exhibit 1 to the declaration of Ryan Klein ("Klein Decl.") depicts a portion of the floor plan at PAD, with the main entrance to the Pavilion, the location of the Sportsbook, and the entrance to the casino marked as "A," "B," and "C," respectively:



## III.     PAD's Surveillance System

13.      There are over ▮▮ security cameras at PAD.  Ex. 5 (Klein Dep.) at 16.

14.      Prior to July 2019, the video surveillance system at PAD used analog cameras, and surveillance footage was recorded on VCRs.  Simmons Decl. ¶ 4; Klein Decl. ¶ 4; Ex. 2 (Simmons Dep.) at 85; Ex. 5 (Klein Dep.) at 17; Ex. 7 (Beck Dep.) at 55.

15.      In July 2019, a new surveillance system of cameras, hardware components, and software manufactured by Avigilon was installed at PAD.  Simmons Decl. ¶ 4; Klein Decl. ¶ 4; Ex. 2 (Simmons Dep.) at 14; Ex. 5 (Klein Dep.) at 16-17; Ex. 7 (Beck Dep.) at 30-31.

16.     The Avigilon surveillance system at PAD was installed by Zuvid Surveillance Technology ("Zuvid").  Ex. 2 (Simmons Dep.) at 78; Ex. 7 (Beck Dep.) at 51.

17.     Zuvid also installed new Avigilon security cameras in the Sportsbook when it opened in September 2020.  Ex. 2 (Simmons Dep.) at 44.

18.     ███████████████████████████████████████████ ███████████████████████ Ex. 2 (Simmons Dep.) at 91-92; Ex. 5 (Klein Dep.) at 24, 82-83.

19.     PAD's surveillance system does not use face recognition.  Ex. 2 (Simmons Dep.) at 44-45, 54-55; Ex. 7 (Beck Dep.) at 22, 48; Klein Decl. ¶ 5.

20.     ███████████████████████████████████████████ ███████████████████████████████████ Ex. 2 (Simmons Dep.) at 54-55; Ex. 7 (Beck Dep.) at 80-81, 93-94.

## IV.    Biometrica Software

21.     Between 2015 and 2019, PAD licensed certain software from Biometrica.  Ex. 5 (Klein Dep.) at 25-26; Ex. 8 (PAD_0002307).

22.     Biometrica did not receive a subpoena issued pursuant to Fed. R. Civ. P. 45 in connection with this matter and has not produced any documents or provided sworn testimony about its software products.  Provance Decl. ¶ 3.



23.     ███████████████████████████████████████████ ███████████████████████████ Ex. 7 (Beck Dep.) at 155, 161-63.

24.     ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████ Ex. 8 (PAD_0002307); Ex. 9 (Beck Dep. Ex. 7).

25. ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████ Ex. 5 (Klein Dep.) at 25; *see also* Ex. 7 (Beck Dep.) at 152-53.

26. ███████████████████████████████████████████████████

██████████████████████████ Ex. 5 (Klein Dep.) at 25-26.

## V.   Appearance Search

27.    In addition to its "Face Recognition" product, Avigilon offers a feature available on some security cameras called "Appearance Search."  Ex. 7 (Beck Dep.) at 81.

28.    Avigilon did not receive a subpoena issued pursuant to Fed. R. Civ. P. 45 in connection with this matter and has not produced any documents or provided sworn testimony about Appearance Search.  Provance Decl. ¶ 4.

29.    Scott Beck, the Director of Surveillance Technology for all Boyd properties, is the only witness deposed by the plaintiffs who had an understanding of Appearance Search. Ex. 2 (Simmons Dep.) at 44-45; Ex. 5 (Klein Dep.) at 29; Ex. 7 (Beck Dep.) at 81.

30.    Mr. Beck testified that Appearance Search "merely allows you to find and classify objects as to is it a person, is it a car, these kind of things," and "allow[s] you to identify very general features of [a] person[;] that it is a person and then what color clothes they were wearing and so forth."  Ex. 7 (Beck Dep.) at 81, 108.

31.    Mr. Beck was not aware of any use of the Appearance Search feature at PAD. Ex. 7 (Beck Dep.) at 81.

32.    Jim Simmons, the Director of Surveillance at PAD, has never used the Appearance Search feature and is not aware of any other PAD employee using or attempting to use the feature. Ex. 2 (Simmons Dep.) at 25, 45, 56-57, 91-93; Simmons Decl. ¶ 5.

8

33. Ryan Klein, a Surveillance Technician at PAD working under Jim Simmons, has never used the Appearance Search feature and is not aware of any other PAD employee using or attempting to use the feature.  Ex. 5 (Klein Dep.) at 29, 137; Klein Decl. ¶ 6.

34.   Ex. 10 (PAD_0000873) (

); Klein Decl. ¶ 14.

35. Mr. Beck understood based on his review of materials available on Avigilon's website that separate "analytics" software must be installed in order to use Appearance Search. Ex. 7 (Beck Dep.) at 86-87.

36. Documents available on Avigilon's website support Mr. Beck's understanding about Appearance Search: for example, an Avigilon System Setup and Workflow Guide states that an additional software program called "ACC Analytics Service" is "not pre-installed and is required for Avigilon Appearance Search feature applications."  Ex. 11 (PAD_0002238) at PAD_0002239; *see also id.* at PAD_0002275 (providing instructions to download and install "ACC Analytics Service software (required for Avigilon Appearance Search feature)").[4]

37. When Zuvid was on site at PAD installing the new security cameras in the Sportsbook,                                                                    Ex. 12 (PAD_0001016) at PAD_0001020 (Email from S. Beck dated 8/31/2021).

38.

Ex. 7 (Beck Dep.) at 85; Ex. 13 (Klein Dep. Ex. 2); Ex. 5 (Klein Dep.) at 64-78.

---

[4]      Defendants offer this statement in Avigilon's installation guide not for the truth of the matter asserted, but to show that Mr. Beck's understanding of these materials was reasonable. *Torry v. City of Chi.*, 932 F.3d 579, 585 (7th Cir. 2019) ("Statements introduced to show their effect on the listener, rather than the truth of the matter they assert, are not hearsay.").

39.  ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████ Ex. 5 (Klein Dep.) at 28-

29; Simmons Decl. ¶ 6.

40.  ████████████████████████████████████████

███████████████ Simmons Decl. ¶ 9; Klein Decl. ¶ 10.

41.  ████████████████████████████████████████

████████████████████████████████████ Ex. 5 (Klein

Dep.) at 137; Simmons Decl. ¶ 10; Klein Decl. ¶ 11.

42.  ████████████████████████████████████████

███████████ Ex. 5 (Klein Dep.) at 137-38; Simmons Decl. ¶ 10.

43.  ████████████████████████████████████████

█████████████████████████████████████████████

██████████████ Simmons Decl. ¶ 11; Klein Decl. ¶ 12.

44.  ████████████████████████████████████████

████████████████████████████████████ Ex. 14

(PAD_0002362-0002374) at PAD_0002362, PAD_0002370, PAD_0002373 (███████████

█████████); *see also* Ex. 5 (Klein Dep.) at 49-64.

45.  ████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ Ex. 5 (Klein Dep.) at 31-33, 58-59; Ex.

14   (PAD_0002362-0002374)   at   PAD_0002363-0002369,   PAD_0002371-0002372,

PAD_0002374 (███████████████████████████████████████████

████).

10

46. ████████████████████████████████████████████████████

████████████████████████   Simmons Decl. ¶ 12.

47. ████████████████████████████████████████████████████

████████████████████   Ex. 5 (Klein Dep.) at 29-30; Klein Decl. ¶ 13.

48. ████████████████████████████████████████████████████

██████   Ex. 5 (Klein Dep.) at 30; Klein Decl. ¶ 13; Simmons Decl. ¶ 13.

49.     As noted above, there is no evidence that PAD ever actually used Appearance

Search.  Ex. 2 (Simmons Dep.) at 25, 45, 56-57, 91-93; Simmons Decl. ¶ 5; Ex. 5 (Klein Dep.)

at 29, 137; Klein Decl. ¶ 6; Ex. 7 (Beck Dep.) at 81;

## VI.    "Site Health" Reports

50.     The Avigilon software installed at PAD can generate "site health" reports,

which show information about the system's security cameras, system capacity and

performance, and other data.  Ex. 7 (Beck Dep.) at 122-23; Ex. 5 (Klein Dep.) at 79; Ex. 10

(PAD_0000873); Ex. 15 (PAD_0002094); Ex. 16 (PAD_0002507).

51. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████   Ex.

10 (PAD_0000873); Ex. 15 (PAD_0002094); Ex. 16 (PAD_0002507).

52. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Ex. 10 (PAD_0000873).

11

53. ████████████████████████████████████████████████

████████████████████████████████████████████████

Ex. 15 (PAD_0002094); Ex. 16 (PAD_0002507).

54. ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████  Ex. 10 (PAD_0000873); Ex. 15 (PAD_0002094); Ex.

16 (PAD_0002507).

## VII.    Plaintiffs Anthony and Audrey Pruitt

55.    Plaintiffs Audrey and Anthony Pruitt provided sworn interrogatory responses in

which they contend that their facial geometry was "scanned" during visits to PAD that occurred

on or about January 3, 2020, January 22-23, 2020, February 14, 2020, August 2020, September

2020, and January 30, 2021.  Ex. 1 (Pls. Resp. to Defs. Interrog.) at 3-4.

56.    Plaintiffs claim that their face geometry was "scanned" by a security camera at

the entrance to the casino.  Ex. 1 (Pls. Resp. to Defs. Interrog.) at 6-11 ("Defendants' [*sic*]

required Plaintiffs to have their faces scanned prior to entering Defendants' casino"); Ex. 3

(Audrey Pruitt Dep.) at 26-37; Ex. 4 (Anthony Pruitt Dep.) at 47-49.

57.    Plaintiffs' interrogatory responses do not identify any other area at PAD where

they contend that their faces were "scanned."  Ex. 1 (Pls. Resp. to Defs. Interrog.) at 6-11.

58.    Plaintiffs' interrogatory responses do not identify any actual damages caused by

defendants' alleged BIPA violations.  Ex. 1 (Pls. Resp. to Defs. Interrog.) at 5-6.

59.    Plaintiffs have not amended or supplemented the interrogatory responses that

they provided pursuant to Fed. R. Civ. P. 26(e).  Provance Decl. ¶ 5.

60.    Neither Audrey nor Anthony Pruitt testified at their depositions that they visited

the Sportsbook or placed wagers on sports events during any of their visits to PAD.  Ex. 3

(Audrey Pruitt Dep.) at 37-38, 44; Ex. 4 (Anthony Pruitt Dep.) at 44-45, 49-50.

12

61.     Audrey and Anthony Pruitt wore face masks when they visited PAD after March 2020.  Ex. 3 (Audrey Pruitt Dep.) at 63-64; Ex. 4 (Anthony Pruitt Dep.) at 61-62.

62.     The only times that Audrey or Anthony Pruitt claim that they were asked to remove their face masks while at PAD were when the Pruitts were at the security desk near the entrance to the casino and when Ms. Pruitt visited the B Connected guest services desk.  Ex. 3 (Audrey Pruitt Dep.) at 44, 63-64; Ex. 4 (Anthony Pruitt Dep.) at 61-62.

63.     

Klein Decl. ¶ 20; Ex. 2 (Simmons Dep.) at 50.

64.

Klein Decl. ¶ 20; Ex. 10 (PAD_0000873) at PAD_0000924; Ex. 15 (PAD_0002094) at PAD_0002144; Ex. 16 (PAD_0002507) at PAD_0002556.

65.

Klein Decl. ¶ 21.

66.

Klein Decl. ¶ 21; Ex. 10 (PAD_0000873) at PAD_0000879-0000880; Ex. 15 (PAD_0002094) at PAD_0002099-0002100; Ex. 16 (PAD_0002507) at PAD_0002512-0002513.

## ARGUMENT

Summary judgment is appropriate when there is no genuine issue of material fact on an essential element of the plaintiff's claim, entitling the defendant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021); *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).  While facts are viewed in the light most favorable

to the non-moving party, "those facts must be supported by sufficient record evidence." *Zylstra v. DRV, LLC*, 8 F.4th 597, 601 (7th Cir. 2021) (citation omitted).  A party opposing summary judgment cannot show the existence of a genuine issue of material fact "solely by pointing to allegations in his pleading; he must instead produce evidence showing that there is a disputed issue for trial." *Valance v. Wisel*, 110 F.3d 1269, 1274 (7th Cir. 1997); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").  Moreover, "a court may consider only *admissible* evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (emphasis added).

## I. The Undisputed Evidence Shows That Defendants Did Not Collect, Possess, Or Obtain Plaintiffs' Biometric Identifiers Or Biometric Information.

Discovery has unequivocally disproved plaintiffs' allegation that PAD used "facial recognition in its video surveillance" system.  FAC ¶ 2.  Plaintiffs therefore cannot point to a "scintilla" of evidence—much less evidence sufficient on summary judgment—that supports their claims.  *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991) (citation omitted).

Jim Simmons, the Director of Surveillance at PAD, testified directly that PAD does not use face recognition. SUF ¶ 19 (citing Ex. 2 (Simmons Dep.) at 44-45, 55).  Scott Beck, the Director of Surveillance Technology for all Boyd properties, testified that he had no knowledge of any "facial recognition capabilities of . . . software solutions used at Par-a-Dice."  Ex. 7 (Beck Dep.) at 22, 48.  Plaintiffs also took the deposition of Ryan Klein, the Surveillance Technician at PAD who works under Mr. Simmons.  Plaintiffs did not even *ask* Mr. Klein about PAD's alleged use of face recognition; they asked him generally whether PAD uses any "artificial intelligence" in connection with its surveillance procedures.  Ex. 5 (Klein Dep.) at 77. ████████████████████████████████████████████ *Id.* ████████████
████████████████████████████████████████████████ SUF ¶ 18 (citing Ex. 2 (Simmons Dep.) at 91-92; Ex. 7 (Klein Dep.) at 24, 82-83).

14

Plaintiffs cannot genuinely dispute these facts; nor can they offer any rebutting evidence of their own. █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████ SUF ¶ 20. ████████████████████████████████

███████████████████████████████████ *Id.*; Ex. 2 (Simmons Dep.) at 54-55 (█████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████); Ex. 7 (Beck Dep.) at 81 (████████████████

████████████████████████████████████████████████████████████████████████

█████).  There is no evidence to the contrary.

The old surveillance system installed at PAD prior to the Avigilon system was completely analog; surveillance footage was recorded on VCRs.  SUF ¶ 14.  There is likewise no evidence that this system used face recognition.[5]  Plaintiffs' case fails on its most fundamental element:  There is no evidence from which a reasonable jury could find that defendants "possess[ed]," "collect[ed], capture[d], . . . or otherwise obtain[ed]" plaintiffs' "biometric identifiers" or "biometric information."  740 ILCS 14/15(a), (b).

## II.   Any New Theory That Defendants Violated BIPA Through The Purported Use Of "Appearance Search" Also Fails For Multiple Reasons.

When discovery confirmed that plaintiffs' allegations of face recognition at PAD were baseless, they began to focus on a different feature available on certain Avigilon cameras called "Appearance Search."  Any attempt by plaintiffs to pivot to a new theory of liability based Appearance Search fails for at least three reasons:  First, there is no evidence that plaintiffs

---

[5]    During this period, PAD also licensed certain software products from the vendor "Biometrica."   SUF ¶ 21.  ████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
SUF ¶¶ 23-25.  ████████████████████
████████████████████████████████████████████████████ *See* SUF ¶ 26.  Thus, defendants' use of Biometrica software has no relevance to the plaintiffs' claims.

ever visited or placed wagers at the Sportsbook— ███████████████████████
████████████████████████████████████████  Second, plaintiffs were required to wear
face masks at PAD during this period fully covering their noses and mouths due to COVID-
19, which would have made any "scan[s] of . . . face geometry" impossible.  Finally, even if
plaintiffs could somehow overcome these deficiencies in any Appearance Search theory—and
they cannot—there is no evidence that Appearance Search is regulated by BIPA.

A.      <u>There Is No Evidence That Plaintiffs Even Entered The Part Of The Casino</u>
████████████████████████████████████████████████████████████████

During discovery, plaintiffs provided sworn interrogatory responses claiming that their
face geometry was "scanned" during six visits to the casino at PAD that occurred between
January 2020 and January 2021.  SUF ¶ 55.  Plaintiffs have consistently claimed that the alleged
"scan" of their face geometry occurred during these visits at a security desk next to the entrance
to the casino.  SUF ¶ 56; *see also* Klein Decl. Ex. 1 (marking this location at PAD as "C").
During her deposition, Ms. Pruitt also suggested that her face geometry might have been
"scanned" a second time on the casino floor by security cameras located at a customer service
desk related to the "B Connected" guest rewards program.  SUF ¶ 62.  ████████████████
████████████████████████████████████████████████████████████████
███████████████  SUF ¶¶ 63-66.  ██████████████████████████████████
██████████  *See* SUF ¶¶ 64, 66.  Thus, plaintiffs' own theory of liability forecloses any claim that
their faces were "scanned" by Appearance Search.

Even if plaintiffs attempted to amend their claims at this late stage,  █████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████  SUF ¶¶ 39, 46-49, 51-54.  Four out of plaintiffs' six visits to PAD occurred in January,
February, and August of 2020, before the Sportsbook opened.  SUF ¶¶ 10, 55.  These visits are
therefore irrelevant to any claim involving Appearance Search.  Similarly, there is no evidence

that plaintiffs ever entered the Sportsbook during either of their later visits to PAD that occurred in September 2020 and January 2021, SUF ¶ 60, ███████████████████

████████████████████████████████████████

███████████████████████████████   *See* SUF ¶¶ 44-45.  Nor could it be assumed that the plaintiffs may have entered the Sportsbook in the course of visiting the casino at PAD.  The casino and Sportsbook are located in separate parts of the property, and guests can walk from the main entrance at PAD to the casino without entering the Sportsbook or coming within range of the security cameras there.  SUF ¶¶ 11-12.  Thus, there is no evidence from which a reasonable jury could find that plaintiffs were even present in the Sportsbook ██████████

████████████████████████████████████

The evidence in this regard is similar to a plaintiff who alleges an injury caused by an exposure to a chemical, but can only show that he worked at a jobsite or facility where the chemical was also present.  It is well-settled that such evidence is insufficient to avoid summary judgment.  *See, e.g.*, *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162 (4th Cir. 1986) ("[W]hen one considers the size of a workplace . . . the mere proof that the plaintiff and a certain asbestos product are at the shipyard at the same time, without more, does not prove exposure to that product."); *Schultz v. Keene Corp.*, 729 F. Supp. 609, 614 (N.D. Ill. 1990) ("The mere possibility that [the plaintiff] could have been exposed to . . . [defendant's] product . . . is insufficient to withstand a motion for summary judgment.").  Application of this principle to plaintiffs' evidence in this case warrants the same result.

### B.    It Is Undisputed That Plaintiffs Wore Face Masks When Visiting PAD In Accordance With Mandatory COVID-19 Restrictions.

Any theory based on Appearance Search fails for another reason:  At all relevant times, plaintiffs were required to wear face masks fully covering their noses and mouths when they visited PAD in accordance with mandatory COVID-19 restrictions imposed by Illinois law. SUF ¶¶ 5-9, 61.  Plaintiffs' face masks necessarily would have prevented Appearance Search

from "scan[ning] . . . face geometry" by covering plaintiffs' faces and thereby the geometry of their facial features.

The only times plaintiffs claim that they removed their face masks while at PAD were at the entrance to the casino and when Ms. Pruitt visited the "B Connected" rewards desk inside the casino.  SUF ¶ 62.  These areas are not located near the Sportsbook and, as noted above, ███████████████████████████████████████████████████████████ SUF ¶¶ 63-66.  Indeed, by focusing their claims on the security camera located at the entrance to the casino (*see* SUF ¶ 56; Ex. 1 (Pls. Resp. to Defs. Interrog.) at 6-11), plaintiffs are conceding that their facial geometry could not have been "scanned" at other locations while they were wearing face masks.  Otherwise, plaintiffs would not have tailored their theory to coincide with the one place at PAD where both plaintiffs claim that they were asked to remove their masks.

Accordingly, even if plaintiffs could place themselves in the Sportsbook during one of their visits to PAD—which they cannot—and ████████████████████████ ████████████████████████████—which they did not—their "face geometry" remained covered by a mask.  Any alleged "scan" of plaintiffs' face geometry by these cameras using Appearance Search would have been impossible.

### C.    There Is No Evidence That Appearance Search Is Regulated By BIPA.

Notwithstanding the undisputed facts discussed above, if plaintiffs nevertheless intend to argue that Appearance Search "scan[s] . . . face geometry" within the meaning of BIPA, it was plaintiffs burden to develop evidence in discovery about how Appearance Search worked.  In particular, plaintiffs would need evidence that Appearance Search worked by calculating "a biology-based set of measurements ('biometric')" of facial geometry "that can be *used to identify a person* ('*identifier*')."  *Rivera*, 238 F. Supp. 3d at 1094 (third emphasis added).[6]

---

[6]    The *Rivera* court's conclusion that the definition of "biometric identifier" is limited to uniquely *identifying* "scan[s] of . . . face geometry" is consistent with the Illinois Attorney General's interpretation of BIPA.  *See* Ill. AG Op., 2017 WL 10084298, at *3 ("[T]he phrase

Plaintiffs cannot assume these facts—particularly when Avigilon offers "Face Recognition" as a separate add-on product, but requires users to purchase an additional software license. SUF ¶ 20. It is unlikely that Avigilon would make the same functionality available in Appearance Search at no additional cost. Moreover, because it is undisputed that defendants never attempted to use Appearance Search (*see* SUF ¶¶ 31-33, 49), plaintiffs must further produce affirmative evidence that merely enabling Appearance Search on a security camera causes the camera to *automatically* collect identifying facial geometry "scans" from surveillance footage even if the Appearance Search feature was never actually used.

Plaintiffs failed to develop admissible evidence on these points. Plaintiffs chose not to issue a subpoena to Avigilon for any documents or sworn testimony about Appearance Search. SUF ¶ 28. Nor can plaintiffs rely on defendants' witnesses to fill this hole in their case. Both members of PAD's surveillance team who were deposed—Mr. Simmons and Mr. Klein—have never used Appearance Search and were therefore unfamiliar with how it worked. SUF ¶¶ 29, 32-33. Only Mr. Beck, who oversees surveillance technologies used across all Boyd properties, had an understanding of Appearance Search. He testified that it "merely allows you to find and classify objects as to is it a person, is it a car, these kind of things." SUF ¶¶ 29-30 (Ex. 7 (Beck Dep.) at 81); *see also id.* at 108 (Appearance Search "allow[s] you to identify very general features of [a] person[;] that it is a person and then what color clothes they were wearing and so forth"). Mr. Beck also testified that he believed Appearance Search required separate "analytics" software, ███████████████████████ SUF ¶¶ 35-38. This testimony

---

'biometric identifier' is commonly understood to refer to the measurement and analysis of a unique physical or behavioral characteristic *that identifies a person*." (emphasis added)). Similarly, BIPA defines "biometric information" as data "based on an individual's biometric identifier" that is "*used to identify* an individual." 740 ILCS 14/10 (emphasis added).

does not come close to raising a genuinely disputed issue of fact about whether merely enabling Appearance Search on security cameras could theoretically violate BIPA.[7]

Without evidence, plaintiffs can only speculate about what Appearance Search does or how it actually worked. However, that is plainly insufficient on summary judgment: "It is well-settled that speculation may not be used to manufacture a genuine issue of fact." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (quoting *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 601 (7th Cir. 2019)).

## III.    Defendants Are Also Entitled To Summary Judgment On Damages.

Plaintiffs have disavowed any claim for actual damages and seek only to recover statutory damages on their BIPA claims. SUF ¶ 58. BIPA permits a plaintiff to recover $1,000 in statutory damages "against a private entity that negligently violates a provision of this Act," and $5,000 against a private entity "that intentionally or recklessly violates a provision of this Act." 740 ILCS 14/20(1)-(2). It is unnecessary for the Court to determine whether plaintiffs may pursue statutory damages on their claims, because there is no evidence of an underlying BIPA violation. *See supra*, at 14-20. But in any event, plaintiffs cannot show that any alleged violation of BIPA by defendants was negligent, reckless, or intentional.

---

[7]      Plaintiffs also questioned Mr. Beck and Mr. Simmons using cherry-picked statements about Appearance Search in documents that plaintiffs found on the Internet. *See* Ex. 2 (Simmons Dep.) at 48-58, 87-93; Ex. 7 (Beck Dep.) at 82-89. These questions drew proper objections that the witnesses lacked foundation to answer them, and in any event, no testimony was elicited during these colloquies that supported counsel's speculation regarding Appearance Search. As for the documents themselves, they are inadmissible hearsay and may not be considered on summary judgment. *See Gunville*, 583 F.3d at 985; *FTC v. Med. Billing Network*, 543 F. Supp. 2d 283, 305-06 (S.D.N.Y. 2008) (rejecting "online magazine articles and advertisements" as "rank hearsay" and therefore inadmissible on summary judgment); *Bethel v. Aikens*, 1994 WL 266565, at *5 (D. Ind. Mar. 9, 1994) ("[N]ewspaper articles and advertisement . . . constitute inadmissible hearsay and cannot, therefore, be considered by the court in determining the existence of a triable issue of fact."). The Court should reject any attempt by plaintiffs to rely on these materials in their opposition brief.

A.      **There Is No Evidence That Defendants Acted Negligently.**

Illinois courts define negligence as objectively unreasonable conduct.  *See, e.g.*, *St. Louis, A & T.H.R. Co. v. Odum*, 156 Ill. 78, 82 (1895); *Great Lakes Dredge & Dock Co. v. City of Chi.*, 260 F.3d 789, 797 (7th Cir. 2001).[8]  Thus, a defendant is not negligent in the alleged violation of a statute if it "acted reasonably under the circumstances, despite the violation." *Test Drilling Serv. Co. v. Hanor Co.*, 322 F. Supp. 2d 957, 963-65 (C.D. Ill. 2003) (citing *Davis v. Marathon Oil Co.*, 64 Ill. 2d 380, 390 (1976)).

Here, the evidence shows that defendants acted reasonably by avoiding any use of facial recognition software at PAD—and that fact alone is dispositive of plaintiffs' claims.  *See supra*, at 14-15.  To the extent plaintiffs' case now focuses instead on the ████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ SUF ¶¶ 39-43.  ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ (SUF ¶¶ 16, 48), it was objectively reasonable for defendants to conclude ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ SUF ¶ 43.  Defendants also reasonably determined, based on review of Avigilon's own documentation, that separate "analytics" software was required to use features like Appearance Search—██████████████████████████████████ SUF ¶¶ 35-38.  In fact, while Zuvid was installing the cameras in the Sportsbook, ██████████████████████████████████ ████████████████████████████████ SUF ¶ 37.  On these undisputed facts, no reasonable company standing in defendants' shoes would have any reason to think that the surveillance system at PAD could potentially violate BIPA.

---

[8]      Because BIPA does not define "negligently," "intentionally," or "recklessly," the terms are defined according to common law.  *Harrison v. Hardin Cty. Cmty. Unit Sch. Dist.*, 313 Ill. App. 3d 702, 705 (2000), *reversed on other grounds,* 197 Ill. 2d 466 (2001).

The evidence also shows that defendants ████████████████████████
████████████████████████ SUF ¶¶ 39-47. ████████████████
████████████████████████████████████████████
████████████████ SUF ¶ 52. ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████ *See* Ex. 10 (PAD_0000873) at PAD_0000931. Defendants were not negligent in uncovering and acting on this information within a matter of weeks.

**B.      There Is No Evidence That Defendants Acted Intentionally Or Recklessly.**

Because there is no evidence that defendants acted negligently, there is likewise no evidence that defendants acted intentionally or recklessly. "Intentional conduct is conduct performed with a 'desire to cause consequences or at least a substantially certain belief that the consequences will result.'" *Rogers v. CSX Intermodal Terminals, Inc.*, 409 F. Supp. 3d 612, 618 (N.D. Ill. 2019) (quoting *Ziarko v. Soo Line R. Co.*, 161 Ill. 2d 267, 272 (1994)). Similarly, "recklessness denotes a course of action which shows an utter indifference to or a conscious disregard." *Id.* (quotation marks omitted).

Nothing could be further from the undisputed evidence in this case, which shows that Defendants never used face recognition at PAD ████████████████████████
████████████████ SUF ¶¶ 18-20. It is also undisputed that defendants never attempted to use Appearance Search at PAD, and defendants never ████████████████████████
████████████████████████████████████████ SUF ¶¶ 31-33, 35-38, 49. These facts support only one conclusion: Defendants had no intention of using face recognition *or* Appearance Search at PAD.

Moreover, while there is no basis for finding defendants negligent, it is even clearer that the evidence cannot support a finding of recklessness. Reckless disregard for a statutory

duty "does not encompass mere '[i]nnocent mistakes or negligence.'" *State ex rel. Schad v. Nat'l Bus. Furniture*, LLC, 2016 IL App (1st) 150526, ¶ 33 (quoting *United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013)).  A finding of recklessness requires evidence that the defendant "ignored obvious warning signs," "buried its head in the sand," or "refused to learn information" that would have made its alleged violation obvious.  *Id.*  There is no such evidence in the record here. ████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ SUF ¶¶ 37,

43; Klein Decl. ¶ 12; Simmons Decl. ¶ 11. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ SUF ¶¶ 39, 52; Simmons Decl. ¶ 6. ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████ SUF ¶¶ 46-47.  These undisputed facts preclude a finding that defendants acted with a "conscious disregard" for any alleged use of Appearance Search at PAD.  *Rogers*, 409 F. Supp. 3d at 618.

## CONCLUSION

For the reasons stated above, summary judgment should be granted on all claims, or in the alternative, summary judgment should be granted on plaintiffs' claims for damages.

Dated:  November 19, 2021

Respectfully submitted,

*/s/ Matthew D. Provance*
Matthew D. Provance
J. Gregory Deis
Nathan A. Rice
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 782-7711—Facsimile
mprovance@mayerbrown.com
gdeis@mayerbrown.com
nrice@mayerbrown.edu

*Attorneys for Defendants Par-A-Dice Hotel Casino
and Boyd Gaming Corporation*

## CERTIFICATE OF COMPLIANCE

I, Matthew D. Provance, an attorney, certify that this brief conforms to the requirements of C.D. Ill. Local Rules 7.1(B)(4) and 7.1(D)(5).   The length of the argument section of Defendants' Motion for Summary Judgment is 3592 words.


 Dated:  November 19, 2021                    */s/ Matthew D. Provance*
                                             Matthew D. Provance

## CERTIFICATE OF SERVICE

I, Matthew D. Provance, an attorney, certify that I electronically filed Defendants'

Motion for Summary Judgment with the Clerk of the Court using the CM-ECF system which

will send notification of such filing to the following counsel of record:

> Ryan F. Stephan
> James B. Zouras
> Catherine T. Mitchell
> STEPHAN ZOURAS, LLP
> 100 N. Riverside Plaza
> Suite 2150
> Chicago, Illinois 60606
> 312.233.1550
> 312.233.1560 *f*
> rstephan@stephanzouras.com
> jzouras@stephanzouras.com
> cmitchell@stephanzouras.com
>
> Steven Smith
> STEVEN SMITH LAW GROUP
> 5555 N Sheridan Road
> Suite 708
> Chicago, Illinois 60640
> 312.622.5545
> Stevesmithlaw88@gmail.com
>
> Nathaniel Arthur Frenkel
> LAW OFFICES OF NATHANIEL A. FRENKEL
> Suite 602
> 659 W Randolph Street
> Chicago, IL 60661
> 847-612-7632
> nathanielafrenkel@gmail.com

Dated:  November 19, 2021                         */s/ Matthew D. Provance*
                                                   Matthew D. Provance

26